May it please the court, my name is Joel Robbins and I have the honor of representing Jeremy Reed and Jesse Dupris who were White Mountain Apache Housing Authority security guards at the time that they were wrongfully accused of being one of the most notorious criminals on the White Mountain Apache reservation history. They were both accused of being the White Mountain Apache or the White Mountain rapist. They in fact were no more than two victims of a misguided prosecution without a particularized victim. Fifteen women were raped or molested during a period of time on the White Mountain Apache reservation. There was a description of a middle-aged man, chubby, 5'6 to 5'9. There were various descriptions. The descriptions were either that he was fat or he was thin, he was tall, he was short. He had a reservation accent. He had a resvoy accent. He had a foreign accent, not foreign in terms of country, but just not a White Mountain Apache accent. Okay. I think the inquiry has to be, it's a little bit different than pointing out all the inconsistencies in terms of because we have, you know, probable cause is what they knew when they arrested them. And in my reading of the record, despite the fact that ultimately there appears to be some mistaken identification, there were a number of people that had identified your clients. And so, you know, we have to determine whether there was probable cause based on what they knew at that time, not the fact that it was mistaken identity. And so that's, and then even if there wasn't probable cause, even if we don't even decide that issue, would they have thought, would a reasonable officer have thought that there was probable cause and, you know, are they entitled to qualified immunity? So the inquiry is more than just like a jury trial in terms of deciding whether the identifications are good, whether they're bad or whatever. Absolutely, Your Honor. I have the trouble of representing. Stick to the mic, would you? Stick with the mic. We're making an audio recording of the. I only was attempting to give myself a different position in the courtroom because I represent two different clients. Let's first look at the case against Jeremy Reed. The only person who identified Jeremy Reed looked at 12 pictures and said he looks like that one. And then he said, but he looked, the victim, the woman said, but he looks more like that one, without ever saying that's the man that raped me. That is not probable cause. The problem at the outset with this case is that the government cast a net over the White Mountain Apache Housing Authority's security guards because, for one thing, they had pictures of them. They took the pictures, put them into a 12-pack and said start looking. What is the significance of the fact that they took it to the prosecutor who said, okay, you've got enough? Well, let's deal with, again, two different prosecutors. Let's deal with the federal prosecutor, Tom Simon. No, Tom Simon turned it down. He did. They took it, okay, but that's not the end of the ballgame. They took it to the tribal prosecutor. And they took it to the tribal prosecutor and in one half hour, without showing her the file, without bringing her a single document. She may not be prosecutor of the year, okay? But they're relying, they have the right to go to the prosecutor. They show the prosecutor what they have. The prosecutor says go with it. What is the significance of that? Well, the problem that you have is providing months long and thousands of pages of investigation to a prosecutor in a half hour without documents, without telling her about the equivocal nature, about the identification of Jeremy Reed. It doesn't have to be her failing, but when she gives him the go-ahead, doesn't that... In a half hour, with knowledge in their mind that Tom Simon, the person who had attended very many, a couple of their meetings, it was described as being a number of meetings that he had attended, with intimate knowledge of the investigation, he says no go. But then they go to a prosecutor in a half hour with no evidence, nothing to show her other than their words. But it's not uncommon that the feds don't want to do something and they leave it to the state. That's not anyone that's been involved in that process. I mean, and the joke always is the feds want everyone on video. They want a confession. They want this, that and the other. And then the state prosecutors take something and they get convictions as far as that goes. So, I mean, the fact that the feds said no, then I think you've got to look at did the state prosecutor exercise independent judgment to the point that it breaks that and... In a half hour, they can't have. She can't have. They didn't give her the documents and say take a look at this. Use your... In a half hour, they lobby her to make the charges. That is insufficient in this case. Did she say she made an independent decision? She did not. She said that, well, the testimony... Did she say? Didn't that prosecutor say she made an independent decision? Of course... You can disagree with it, but represent the record accurately. I understand, Your Honor, and I'm trying to say that, yes, she said that in the half hour I was convinced, but that's the problem because you can't go and lobby without giving the inconsistencies that they had by their own knowledge. They knew that Jeremy Reed was being accused based on someone saying that looks like more like that person. They didn't tell her that. If you're really going to bear in on what Jeremy Reed, this victim said this, well, then your argument doesn't fall too good for Dupree because Dupree didn't have just one. Dupree had two victims that identified Dupree from the photo lineup. Another eyewitness of another assault identified Dupree. Other victims provided details of their attacker that matched Dupree. And Dupree lied about his residence, and the polygraph answers were deemed deceptive. Let me put my Jesse Dupree hat on. Oh, you better because the more you hammer on Reed and only one victim and not a very good identification, the more you hammer Dupree's argument to the tail. I don't think I acknowledge, I don't think in pointing out how completely devoid of any evidence on the one side that it somehow argues against Jesse, because Jesse was identified as being a person who had raped a girl who was intoxicated at night, who had difficulty seeing in a lineup that took her 13 minutes to find, 10 months after, took her 13 minutes to point to a picture which indicated that it was him. There were two victims who identified Dupree. I had to do them one at a time. LT was the first, and she acknowledged that the person had a mask on. The second witness identified a 30-year-old man who was 5'6". Jeremy is 6'4", a significant 7-inch difference. It's only 4 inches different, though, than Mr. Aday, who was arrested on the 13th, 7 days before Jesse and Jeremy were arrested. 6'1", chubby, local accent, fit a number of the qualifications, had acknowledged that he had raped one and possibly more, well, he said he had raped more, but they said, well, you used a car in your rapes. Well, guess what? People that go in cars can get out of cars. What we're dealing with here is victims who were victimized because they were intoxicated, they were young, it was done at night, and many of them were with a mask. And when the physical description of both M&M, and I think it was BR, but it's difficult for me to recall, but there were two victims. LT was the one that described, that identified a person with a mask, and the other victim was one that had a physical description that was inconsistent with Jesse Dupree. But the problem that we have in this case is that when the government casts a net over a finite group of people and puts pictures of them and gives them to people as a six-pack, they can land on someone. They can land on someone not because of a particularized suspicion that that person has committed a crime, but because of the 12, reminds me of that one, with a mask on, who knows. The problem that we have in this case, unlike all the cases we cited, take the instance of the person who was accused of being a robber based on at least a dog getting to his apartment and then him not answering the door. At least a dog leads him somewhere. It's not a bunch of victims that come in and say, 10 months ago I was raped. I was raped at night by a man with a mask. Oh, here's some pictures. There's no proof in the record that they could identify. Sure, they pointed at him. I'm sure that they wanted more than life itself to identify the rapist that was victimizing women on the reservation. But when Mr. O'Day is arrested seven days before Jeremy and Jesse, do they go back out? Do they give them the opportunity to identify this man who's three inches shorter, five pounds heavier than Jeremy? This case screams for justice. That call was denied in the report. You have the opportunity to make that call. Do you want to discuss any other issues? Your Honor, I'm ready to answer any questions that are reserved for the remainder of my time. Thank you, Mr. Roberts. Good morning. Good morning, Your Honors. May it please the Court, my name is James Bartolotti. I'm from the Department of Justice. I represent the federal defendants, which include the United States and the BIA agents on this appeal. At this time, I respectfully request five minutes of my time for my co-counsel who represents the tribal officers in their individual capacities. Plaintiff's appeal should be denied, Your Honor, and lower court orders affirmed because, you know, straightforward.  Well, I'm not sure on some, I'm not as confident on some of the material fact issues. I think now if the court were to determine that probable cause existed, then that's the end of the inquiry at that point. If the court questions the probable cause, then you go to the second prong for the qualified immunity, correct? With regard to the individuals. And then with regard to the federal, well, the federal government, the United States, then it's looking to whether it's a discretionary function, correct? That's correct. And if the court finds that, then that's the end of the inquiry, and you don't need to go into all of the summary judgment issues or material fact issues. There are many aspects to this. I would like to focus on just three, but I can get into the probable cause issue if the court would like. As you heard plaintiff's counsel mention, they seem to be focusing only, not seem to be, they are focusing only on the photo IDs and the differences in characteristics, height and weight. But that's all they're focusing on. They don't talk about the fact that both Mr. Reid and Mr. Dupree were security guards who had access to police equipment, police training, which were all used in these sexual assaults and rapes. They don't focus on the fact that a White Mountain Apache tribal officer saw Mr. Dupree running out of where the trail was, wearing a shirt that said security, then changed into his White Mountain Apache security shirt. How many months advanced of the crimes was that? Your Honor, that was in August of 2006, on or about when one of the rapes occurred. Unfortunately, the officer did not recall the exact date. It was the middle of the month of August and the rapes since they were reported, and they don't remember the exact date. But it was about that time. It was suspicious. That wasn't the only factor regarding that. There was the failed polygraph from Mr. Dupree. There was his evasiveness. I'll be fair. Mr. Dupree, I think I questioned counsel about Mr. Dupree because he was harping pretty heavily on Mr. Reid. Why don't you focus on Mr. Reid? What's the best I can say about Mr. Reid? Identification is terrible. The identification has its holes. Yes, Your Honor. It is terrible. Match the heightened description of several witnesses and victims. That's terrible. It did not. But, Your Honor, that's only one factor. That was the starting point. I understand. I'm going down the factors. Lived in the Bengay housing area. How many people didn't? Worked for the WMHA as a security guard. How many didn't? Was evasive and refused to speak. That doesn't seem to me to give me much probable cause. Well, Your Honor, these are factors that... I mean, I go down every one of these factors that were in the district court's idea of a good time here as to why there might have been probable cause. And I guess I'm having a tough time understanding how any one of them, even added together, could make probable cause for Reid. Well, Your Honor, at the time under Blankenhorn, at the moment of arrest, the officers believed, with this knowledge, that there was enough. And it wasn't just the one identification. Well, I mean, believed. How could they have believed if they'd all known it? If they'd all known how the victim was identified. If they'd all known what the problem is with the heightened weight descriptions. If they'd all known about how bad it looks just to go on the Ben Gay housing area. If they'd all known that the only person with a flashlight... Well, goodnight, the fact... That isn't even so, that the person with the flashlight was a blue light. Well, Your Honor, the blue light flashlight came from his supervisor. He said he was the only one in that. And once again, Your Honor, these are things that add up. It wasn't just one separate one. Well, you can't add up bad things to get the good. No, Your Honor, you can't. But you can add up small things that by themselves might be inconsequential. But when you add them all up, you are going to tip the scales as to probable cause. And that's what the whole totality of the circuit... What's your best assemblage of the evidence? Just tell me in, you know, 30 seconds. What's your best evidence? Your Honor, three of the victims ID'd. One ID'd and the other two leaned toward. I know they weren't perfect, but they kept referring back to Mr. Reed. That was the beginning. The one who ID'd him? Yes, Your Honor, that was BL. Did she say the guy was wearing a mask? No. In fact, there was no... The record is devoid of these victims saying whether or not the... The victims with regard to Reed, whether or not he wore a mask. So these are the ones you just described, said he was not wearing... Did not say he was wearing a mask. Either they want a question about that, Your Honor, or it's not in there. That's correct. Okay, so go on. But that exact person, the one identifying, what's the problem? The problem is they didn't even say that was the person. They said it looked similar to this. Yes, Your Honor. That's the best, and they identified somebody else first. Your Honor, and she kept returning back to that individual. Then you had the two other victims, C.C. and S.R., who returned to him. He met the other characteristics, too. Bushy eyebrows. S.R. said his eyes. She knew his eyes. Now, whether or not wearing a mask, you're still going to see the eyes. And he was the one with the quote-unquote res boy, a reservation accent. So she knew him from the reservation. Now, I know that when you're looking at all males on the reservation, it doesn't seem like a lot. But when you whittle them down and then you add in the fact that they were security guards, that they had access to police equipment during the time that the rapes were occurring, and most damaging, Mr. Dupree, when he was questioned himself, said when he was asked, who do you think, who does he point out? He points to Mr. Reed. And when asked why. So because somebody I think is guilty points to somebody else, he automatically comes up to probable cause? No, Your Honor. But that's one of the factors that adds on to the list. That's one of the factors in probable cause that led the officers to believe. And it's not perfect, Your Honor, as you know. It's not a science. Well, I understand it's not a science. My worry is that when I take each one of those things the court put down as factors that lead to it, and they're each challengeable on their own, I'm having a tough time coming up with probable cause after that. Well, Your Honor, I mean, the factors that were outlined, the court looked at them, and the court determined that there was probable cause. And even if probable cause was not found, we could, with regard to the United States, we then look to the discretionary function exception. I understand as to the United States where you're going to go. My worry is as to Reed and as to individuals as to Reed. You mean the individual defendants, Your Honor? Right. Well, the individual defendants, then, Your Honor, we look to probable cause. Right. I'm sorry, I'm sorry. We look to qualified immunity. And with regard to the individuals. Well, a qualified immunity, it would be hard for me to suggest that one thinks they're doing it right if they don't have what they should have for probable cause. And if they reviewed everything I've looked at, I don't know how they could have thought they had probable cause. Well, Your Honor, and that takes me to my next point. With the individuals that are remaining, we only have Officer Hernandez, Officer Lopez, and Officer Proctor. Right. They were not the ones who made the probable cause determination. They gathered the evidence, sent it to Agent Whiting, who then disseminated it to McCoy and Youngman, who made the decision. They were not present for the arrest, except for Hernandez in a backup role when Reed was arrested. But they were not present for the arrests. They were not present for the determination to arrest. They had nothing to do with the prosecution. What do I do if Paula King fit into this? Paula King, sir? Your Honor, Paula King was the prosecutor who then gave the authority to McCoy and Youngman to go forth and arrest them. Is she prior to the arrest? Yes, Your Honor. What is the significance of that? Is that the end of the ballgame? We believe so, Your Honor. We believe that the prosecutor's independent judgment in deciphering that and allowing it. Well, appellant's counsel seems to take, says how in a half hour, and if she's not supplied with all the appropriate information, how can she exercise independent judgment? Well, Your Honor, with all due respect to opposing counsel, this argument here is lasting a half hour, and Your Honors are finding out some pretty good information. But Your Honors have been studying this thing for quite a while. Yes, Your Honor. And this good prosecutor didn't have any idea. Well, Your Honor. He was stuck for 30 minutes. And we read what they say. Is that correct? Did she only have it for 30 minutes? According to the record, Your Honor, she doesn't recall how long it lasted. McCoy and Youngman said it lasted about 30 minutes. And they did provide her, contrary to what plaintiff's counsel says, he says a half an inch thick worth of documents. Well, but just a minute. AER 358, 359. There weren't any materials, written materials brought with you. No, there wasn't. We would have certainly let her know that we had people that identified him through photo lineups and so forth. 359. We would have let them know, but we didn't at the end of this 30-minute meeting with no materials. And we certainly would have let her know people had identified. Well, if they just told what they identified, in fact, that's what she said later on. If the way that was identified led to Reed, they should have also arrested the other guys she pointed to first. Well, Your Honor, there were other factors with regard to Reed that led them to believe that and led the prosecutor to give her authority. I'm cutting into my co-counsel's time. We believe that there are sufficient. Thank you, Your Honor. We'll hear now from Ms. Gilbride. Good morning. Good morning, Your Honors. Eileen Gilbride here for the tribal defendants, the tribal officers. Who are they specifically? Give me their names. Perfilia Massey and Joshua Anderson. These are the two tribal officers. Got it. And I really don't have a whole lot to add to our brief. I would echo my co-defendant's counsel on the probable cause and the qualified immunity arguments. Well, obviously there is probably a point where let's just say hypothetically that they bring in a stack that's a half-inch and it's undisputed that the prosecutor reviewed it for a minute and then charged someone. Would that break the chain? Well, she didn't review it for a minute. She reviewed it for 30 minutes. I said hypothetically. I'm sorry. I'm sorry. I mean, just because a prosecutor looks at something. Well, she did. I mean, there needs to be something more than that, correct? Probably. I mean, even though she did avow, and that avow is undisputed, that she used her independent judgment. And also, the evidence in the record is that the tribal officers, when they were doing or Officer Massey, when she was preparing the charge, looked at the evidence that she had, that the task force had developed, and wrote down the charges independently. Was there any indication? Let's just say this isn't a great case, and it turned out to be one that the identifications obviously weren't correct, if we go on what ultimately happened in the perpetrator. So let's just say the investigation wasn't great, that the identifications ended up being mistaken. Now, Judge Smith was taking your colleague on about breaking down every point of the probable cause. Is that, if you can find fault in every part of the probable cause, is that the right approach to take to the probable cause analysis? It's a totality of the circumstances, as my colleague was arguing. And it wasn't just, as he said, the one identification, the mask or the not mask. I think the blue flashlight is a big piece of the evidence, because he was the only one who had the blue flashlight. But just a minute. Flashlights with halogen bulbs are widely available and common in households, aren't they? I don't know the answer to that. But I do know that in the record it said that he was the only one with the blue light. Well, it was limited to the WMHA employees, correct? Correct. He had no knowledge of who else in the public had a halogen light. No knowledge. My understanding of the record is that the supervisor knew that Reed was the only one who had a blue. In the WMHA employees. Correct. But we're not talking about the WMHA employees. We've got a halogen light. Well, we are if the suspect was posing as an officer or as a security guard, and that's why it was narrowed and narrowed and narrowed down. There are a bunch of different players here. What was the basis for Massey and Anderson's dismissal? They were sued under the Federal Torture Claims Act? They were sued under Bivens, Your Honor. And the point that I really would like to make here is that tribal officers enforcing tribal law against an Indian can't be sued under Bivens. And that's the additional reason why my clients should be, the summary judgment for them should be affirmed, because there is no claim against them under Bivens. Because they were not acting. They were not federal. That's correct. So could they be sued under the Federal Torture Claims Act? They were not. I believe they were only sued under Bivens. My understanding is that Judge Rosenblatt ruled that even if they could. Even if they were, they're still not, they don't fit. They have some kind of immunity because of Arizona state law? He did say that. That's correct. But in addition, the tribal officers don't meet the definition of law enforcement officer under the FTCA because they have to be authorized to enforce federal law, and our officers were not. So if we're going to affirm as to Massey and Anderson, on what ground? Under, if you put aside probable cause and qualified immunity, which are the first two grounds, then they cannot be sued under Bivens because they're not federal agents. They're not federal law officers. They're not acting under federal color. And that's what Judge Rosenblatt tells us. Correct. Under color of federal law, and under the FTCA, they don't meet the definition of a law enforcement officer because they're not authorized to enforce federal law. If we decided on the probable cause, qualified immunity basis, that we don't have to get into this quagmire. That's correct. Okay, gotcha. Judge Smith, did you have something? All I was going to say is it seems to me they were part of a federal law enforcement task force. They were in there, as I understand the evidence, the whole group making the decisions as they went. So I'm just trying to figure out why, on summary judgment, without knowing more about what they did and what they didn't do, I would want to throw them out based on federal law enforcement officer for the purposes of the FTCA. But if you look at the cases, they say that you have to be qualified, you have to be able to enforce federal law. And under the symbiotic relationship test, either the federal government has to profit from their participation. Well, they certainly have evidence that that was happening because the only reason the Indian officers were even put involved at all was so that they could make the arrests on the reservation. But that didn't profit the federal government. What do you mean it didn't profit them? They didn't want to make the arrests themselves, so they took Anderson and Massey and had them do the arrests because they knew they had the power to do it on the reservation. Correct, but that isn't a profit to the federal government. That is... It's not a profit to them? No. Under the cases that say the federal government has to be in a symbiotic relationship so that they get some either financial profit or betterment, that didn't do anything for the government. Yes, these folks were arrested, but that didn't do anything to profit the government. All right. Thank you. Okay, thank you. Mr. Robbins, back to you. Thank you. Obviously having two additional people on the task force able to go out and do interviews did profit the federal government in that they didn't need to have two people in addition to the task force, and they had two people that could make arrests. The error that you can see manifest in today's argument made by the defendants and the appellees in this case is that for some reason they focused on the White Mountain Apache Housing Authority. No woman said the man who raped me went back to that building, and I know that he's a member of the White Mountain Apache Housing Authority. No one said he was wearing a White Mountain Housing Authority T-shirt or a White Mountain Housing Authority badge. They were the people that were charged with watching the White Mountain Apache Housing Authority's homes. They lived in the neighborhood, and no one identified them as someone that was familiar to them. Let me tell you the concern I have, and I've raised it before, and maybe you can put my mind at ease about it. Thank you. Suppose Paula King had taken two weeks to study the case and came back and said, I'm satisfied, go out and arrest him. Would they be entitled to rely on that? In the restatement, if they had not misled her, if they had provided her all the evidence, If she took two weeks. Right. Well, there's a dispute as to how much material she actually had, but let's assume that she had all the material. Let's assume that she, I think that under the restatement that's evidence of probable cause, but I don't think it's necessarily conclusive. For us to agree with you, we'd have to hold that if a prosecutor only looks at a case for 30 minutes, that's not enough for the cops to rely on. I mean, that's basically what, I mean, if there's a factual, if they had gone in and they could say there was no factual dispute, we told her, hey, you know, this was, we gave, we showed these IDs, this person was inconclusive, this person, I don't think that removes the ability to go after them, but that's not the issue we face in this case. Since summary judgment was granted, we have to assume everything that's not proven or if it's in dispute, that it would go in our favor. 30 minutes with no documents. What evidence is in the record of misrepresentations by the officers? The one that we pointed to in our briefing was the, well, in 30 minutes, it's funny because you compare 30 minutes that we've spent together after all having spent innumerable hours reviewing the actual. Well, that's speculation. What evidence is there in the record that the officers misrepresented something? What's your best evidence? Yes. Well, there was the, for Jeremy Reed, the BL person who had pointed at both, circled both, in the report it was not evident that she had identified both and said this one looks the most like it. In the actual photographs, the one that she circled, she circled two. That wasn't presented to her. Her inconclusiveness wasn't presented to her. The prosecutor, when presented that additional evidence, said, well, why didn't they arrest both of them? And I think, Judge Smith, you pointed that out. But I do want to say this, that this is a summary judgment. And if there is no evidence about what was said during that half hour and you find in our favor or the presumption is that you'll find in our favor because there is no evidence about it, how can you grant summary judgment? If it's inconclusive by its very nature, summary judgment is inappropriate. What is wrong with that argument? Bring it. Because I believe it's a correct, I believe it's a correct, I believe it's a. . . I'm trying to pull out exactly what you're saying there. But in terms of that, I know that, you know, the party that summary judgment is granted against gets all inferences in their favor. But it doesn't mean you can make things up for them. True. But a half hour with no evidence, I think, is evidence of itself. And then it becomes a question of what exactly did they tell him. No one remembers. Well, you mean a half hour of no evidence. That can't be a correct statement because you have half an inch of police reports. There was some testimony that there was nothing given to her, somewhat, that they gave her a half inch, but no evidence that she reviewed it during that time, during the half hour that they were given that information. What did she say, though? What did she say? If you say there's no evidence that she reviewed it in that time, what did she say she did? Well, let's put exactly what she did. When she eventually reviewed the evidence, she dismissed with prejudice all of the claims against both. No, she said there wasn't enough. She said there was still probable cause, but that there wasn't enough evidence to convict people and prove beyond a reasonable doubt. And it's the law. You can't argue with me on this point. Probable cause and beyond a reasonable doubt are not the same thing. I absolutely agree. You're absolutely right. But the problem with pointing the mischief. And probable cause, what you know here, is what we're looking at as opposed to what we know here. So, I mean, that we agree on. They need a particular person who committed a crime. They've got the crime. They've got 15 victims. There was a crime. But the particular person is their problem. When you just cast a net over the housing authority security guards, because they have access to handcuffs, it is not against the law to look the most like a rapist out of 12. Gotcha. Thank you, Your Honor. Thank you very much. The case just argued is submitted. Good morning. Nice job by all counsel in this case.
judges: Silverman, Callahan, Smith